Opinion issued October 1, 2009 

 














In The

Court of Appeals

For The

First District of Texas






NO. 01-08-00641-CV

__________


UNION CARBIDE CORPORATION AND HEXION SPECIALTY
CHEMICALS, INC., Appellants


V.


OLIVER D. SMITH AND PEGGY ANN BOWEN SMITH, Appellees






On Appeal from the 122nd District Court

Galveston County, Texas

Trial Court Cause No. 06CV1393






O P I N I O N

 Appellants, Union Carbide Corporation and Hexion Speciality Chemicals, Inc.
("Hexion"), (1) challenge the trial court's judgment entered in favor of appellees, Oliver
D. Smith and Peggy Ann Bowen Smith, after a jury trial, in the Smiths' suit against
Union Carbide and Hexion arising from Oliver's exposure to asbestos and subsequent
development of mesothelioma. (2) In its first issue, Union Carbide contends that there
is no evidence that it controlled the details of Oliver's work, which is necessary to 
establish liability against Union Carbide, as a premises owner, for the injuries of
Oliver, an employee of an independent contractor working on Union Carbide's
premises. (3) In its second issue, Union Carbide contends that the evidence is legally
and factually insufficient to establish that asbestos exposure at its Texas City plant
proximately caused Oliver's mesothelioma. Specifically, Union Carbide contends
that the Smiths presented "no scientifically reliable evidence of the approximate dose
of asbestos" to which Oliver was exposed at Union Carbide's facility, no evidence as
to what portion of Oliver's total asbestos exposure occurred while he worked at
Union Carbide, and no evidence that the dose of asbestos to which Oliver was
exposed at Union Carbide constituted a substantial factor in causing his
mesothelioma. 

 In its first issue, Hexion contends that the evidence conclusively establishes
Hexion's affirmative defense that the Smiths' claims are barred under the exclusive
remedy provision of the Texas Workers' Compensation Act. (4) In its second issue,
Hexion contends that the evidence is legally insufficient to establish that its
negligence proximately caused Oliver's mesothelioma. Hexion specifically contends
that the Smiths presented no evidence "quantifying the approximate dose of asbestos,
if any, that [Oliver] received during his employment by Hexion," of the "threshold
below which [Oliver's] disease would not have occurred," or that Hexion's
negligence caused Oliver's mesothelioma "or at least caused him to receive a dose"
sufficient to cause mesothelioma. In its third issue, Hexion contends that the
evidence is legally insufficient to establish that it was foreseeable to Hexion that
Oliver would develop mesothelioma from his asbestos exposure. In its fourth issue,
Hexion contends that the evidence is legally insufficient to support the jury's finding
of gross negligence and the imposition of exemplary damages. In its fifth issue,
Hexion contends that the trial court erred in allowing the Smiths' counsel to raise the
issue of Hexion's gross negligence for the first time in her rebuttal argument and thus
depriving Hexion of the opportunity to respond to the issue in its closing argument. 
 We reverse the trial court's judgment and render a take nothing judgment in
favor of Union Carbide and Hexion.

Background

 In 2005, Oliver was diagnosed with mesothelioma, a cancer of the lining of his
lungs caused by his exposure to asbestos during his employment as a pipefitter and
general laborer for numerous employers at numerous work sites throughout his career.
 The Smiths sued numerous defendants, including Union Carbide, the owner of one
of the premises at which Oliver worked as an independent contractor, and Hexion, a
successor-in-interest to Smith-Douglas, one of Oliver's former employers. The case
proceeded to trial against Union Carbide and Hexion, and the jury found that the
negligence of Union Carbide and Hexion, among others, caused Oliver's
mesothelioma. The jury further found Union Carbide 2% responsible and Hexion
50% responsible for Oliver's mesothelioma. Finally, the jury found that Hexion was
grossly negligent. Pursuant to the jury's verdict, the trial court entered judgment in
favor of the Smiths and against Union Carbide and Hexion and awarded the Smiths
damages in the amount of approximately $150,000 against Union Carbide and $4
million against Hexion. 

Control

 In its first issue, Union Carbide argues that the trial court erred in denying its
motion for judgment notwithstanding the verdict because the Smiths presented no
evidence that Union Carbide controlled the details of Oliver's work, which must be
shown to establish its liability as a premises owner for the injuries of Oliver, an
employee of an independent contractor employer working on Union Carbide's
premises. See Tex. Civ. Prac. & Rem. Code Ann. § 95.003 (Vernon Supp. 2008). 
Union Carbide asserts that, under Chapter 95, and pursuant to the trial court's jury
charge, the Smiths had to prove that it retained or exercised control over Oliver's
work. Union Carbide further asserts that evidence showing that it provided its
contractors with some limited supplies and specifications does not demonstrate that
it retained or exercised control over the manner in which Oliver performed his work.

 A judgment notwithstanding the verdict is proper when a directed verdict
would have been proper. Tex. R. Civ. P. 301; Fort Bend County Drainage Dist. v.
Sbrusch, 818 S.W.2d 392, 394 (Tex. 1991). We review both the denial of a motion
notwithstanding the verdict and a challenge to the legal sufficiency of the evidence
as "no evidence" points of error. Steinberg v. Comm'n for Lawyer Discipline, 180
S.W.3d 352, 355 (Tex. App.--Dallas 2005, no pet.). We will sustain a legal
sufficiency or "no-evidence" challenge if the record shows one of the following: (1)
a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the
court from giving weight to the only evidence offered to prove a vital fact, (3) the
evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence
conclusively establishes the opposite of the vital fact. City of Keller v. Wilson, 168
S.W.3d 802, 810 (Tex. 2005). In conducting a legal sufficiency review, a court must
consider the evidence in the light most favorable to the verdict and indulge every
reasonable inference that would support it. Id. at 822. If the evidence allows only one
inference, neither jurors nor the reviewing court may disregard it. Id. However, if
the evidence at trial would enable reasonable and fair-minded people to differ in their
conclusions, then jurors must be allowed to do so. Id. A reviewing court cannot
substitute its judgment for that of the trier-of-fact, so long as the evidence falls within
this zone of reasonable disagreement. Id.

 The Smiths brought their claims against Union Carbide under Chapter 95 of the
Texas Civil Practice and Remedies Code, and neither party disputes its applicability
on appeal. (5) Section 95.003 of this chapter, entitled "Liability for Acts of Independent
Contractors," provides,

 A property owner is not liable for personal injury, death, or
property damage to a contractor, subcontractor, or an employee of a
contractor or subcontractor who constructs, repairs, renovates, or
modifies an improvement to real property, including personal injury,
death, or property damage arising from the failure to provide a safe
workplace unless:


(1) the property owner exercises or retains some control
over the manner in which the work is performed,
other than the right to order the work to start or stop
or to inspect progress or receive reports; and 


(2) the property owner had actual knowledge of the
danger or condition resulting in the personal injury,
death, or property damage and failed to adequately
warn. (6) 


Tex. Civ. Prac. & Rem. Code Ann. § 95.003 (Vernon Supp. 2008).

 The requisite control can be contractual or actual. Vanderbeek v. San Jacinto
Methodist Hosp., 246 S.W.3d 346, 352 (Tex. App.--Houston [14th Dist.] 2008, no
pet.) (citing Dow Chem. Co. v. Bright, 89 S.W.3d 602, 606 (Tex. 2002)). Because the
Smiths do not cite any evidence showing that Union Carbide exercised or retained
control contractually, we focus on actual control. See id. In order to have actual
control, a property owner "must have the right to control the means, methods, or
details of the independent contractor's work to the extent that the independent
contractor is not entirely free to do the work his own way," and the "right to control
the work must extend to the 'operative detail' of the contractor's work." Ellwood
Texas Forge Corp. v. Jones, 214 S.W.3d 693, 700 (Tex. App.--Houston [14th Dist.]
2007, pet. denied) (emphasis added) (citing Chi Energy Inc. v. Urias, 156 S.W.3d
873, 879 (Tex. App.--El Paso 2005, pet. denied)); see also Arsement v. Spinnaker
Exploration Co., 400 F.3d 238, 249 (5th Cir. 2005) ("The requisite control factor is
narrowly construed: the owner must control the "mode or method" of the contractor's
work."). Actual control is not established by evidence showing that the property
owner maintained general "control of the facilities." Vanderbeek, 246 S.W.3d at 352. 
Moreover, "merely exercising or retaining a general right to recommend a safe
manner for the independent contractor's employees to perform their work is not
enough to subject a premises owner to liability." Dow Chem. Co., 89 S.W.3d at 607
(emphasis added) (citing Restatement (Second) of Torts § 414 cmt. c (1965)). 
Finally, the actual control "must relate to the injury the negligence causes." Dow
Chem. Co., 89 S.W.3d at 607. 

 As noted above, in evaluating actual control, Texas courts have generally
focused on determining whether the property owner retained or exercised actual
control over the manner in which the plaintiff-independent contractor or
subcontractor performed his job. (7) See id.; see also Phillips v. Dow Chem. Co., 186
S.W.3d 121, 136 (Tex. App.--Houston [1st Dist.] 2005, no pet.). In accord with the
majority of the Texas courts on this subject, here, the trial court submitted a question
to the jury, which neither party challenged, asking the jury to determine whether
"Union Carbide exercise[d] or retain[ed] some control over the manner in which
[Oliver's] work at Union Carbide's premises was performed, other than the right to
order the work to start or stop or to inspect progress or receive reports." An
affirmative finding by the jury to this question was a predicate to Union Carbide's
liability in this case. 

 In support of their argument that Union Carbide retained or exercised actual
control over the manner in which Oliver's work was performed, the Smiths assert that
there is evidence that Union Carbide employees "actively poisoned" Oliver's
"breathing zone" while he was working on the Union Carbide premises, "thus
ensuring that he could not perform his job in a safe manner." The Smiths argue that
Union Carbide was "in direct control over the activity that harmed" Oliver because
"Union Carbide employees working with asbestos pipe insulation in [Oliver's]
vicinity created clouds of asbestos dust to which he was exposed." The Smiths argue,
thus, that, by "actively creating a dangerous condition," Union Carbide had a duty to
warn or protect Oliver. 

 The Smiths also assert that Union Carbide controlled Oliver's work by
providing Oliver with asbestos gaskets and requiring that he use these gaskets in the
course of performing repair and new construction work on Union Carbide premises. 
The Smiths further assert that Union Carbide retained active control over asbestos-related safety information at the plant. Finally, the Smiths argue that Union Carbide
controlled the manner in which Oliver and his employing-contractor performed their
work because Union Carbide required, through specifications, that asbestos insulation
be applied to the pipes that Oliver and his employing-contractor were constructing.

 We first note that there is no evidence to support the Smiths' assertion that
Union Carbide directly employed the insulators whose work created clouds of
airborne asbestos dust in Oliver's vicinity. When asked whether these insulators were
Union Carbide employees or contractors applying insulation in his vicinity, Oliver
answered, "either one or both." When asked who tore off the old insulation while he
worked at Union Carbide, Oliver stated, "The old insulation that was left would have
been either by Carbide or their contractors . . . I don't know for sure which one it was. 
It was one or the other." Thus, to the extent that any such evidence is relevant to the
issue concerning the manner in which Oliver's work was performed, there is no
evidence that Union Carbide directly employed insulators or controlled other
employees who exposed Oliver to asbestos during the course of tearing out or
applying asbestos insulation. 

 Second, although there is some evidence that Union Carbide supplied and
specified the use of some asbestos-containing products on its premises, including
gaskets and insulation, and although there is even evidence that Union Carbide
supplied Oliver with asbestos-gaskets that he used in the course of some of his work
at Union Carbide, there is no evidence that Union Carbide exercised or retained any
control over the manner in which Oliver's work was performed, which is what was
required by the predicate jury question to impose liability upon Union Carbide and
is expressly required by Chapter 95. See Tex. Civ. Prac. & Rem. Code Ann. §
95.003. In fact, Oliver himself testified that no one from Union Carbide ever told him
how to do his job, and he agreed that he received all of his work instructions from his
contractor employer. Oliver's exposure to asbestos at Union Carbide did not occur
as a result of the mere provision of asbestos-containing gaskets. Rather, Oliver's
exposure occurred, in part, as a result of the manner in which he ground the gaskets,
and the fact that he did so without breathing protection or the employ of other safety
measures. There is simply no evidence that Union Carbide controlled the manner in
which Oliver performed this work. Moreover, although Jim Rapp, a Union Carbide
employee, agreed that contractors in general did not have discretion to deviate from
Union Carbide specifications, Rapp further stated that Union Carbide did not instruct
its contractors on how to do their jobs, noting that they were "craftspeople, and they
knew what they were doing." Rapp stated that Union Carbide was not in control of
the details of any contract insulator's work. We conclude that the fact that Union
Carbide provided certain specifications and materials for the projects to be completed
on its premises does not constitute evidence that Union Carbide retained or exercised
any control over the manner in which Oliver performed his work. See Koch Refining
Co. v. Chapa, 11 S.W.3d 153, 156 (Tex. 1999) ("Every premises owner must have
some latitude to tell its independent contractors what to do, in general terms, and may
do so without becoming subject to liability.").

 Finally, the Smiths refer us to Rapp's testimony that Union Carbide supplied
the contractor or employee insulators over whom he had supervision with information
about the hazards of asbestos at safety meetings. The Smiths also cite excerpts from
Union Carbide's manual for contractors, which provides that safety meetings would
be conducted when warranted and that the contractor's supervisors would be required
to attend such meetings. However, this evidence is not sufficient to impose liability
upon Union Carbide. See Bright, 89 S.W.3d at 608 (holding that presence of property
owner's safety employee and implementation of safe-work permit system insufficient
to establish actual control); Ellwood Texas Forge Corp., 214 S.W.3d at 702 (stating
that "a premises owner, by requiring an independent contractor to follow its safety
rules and regulations, does not owe the independent contractor's employee a duty to
ensure that the employee does nothing unsafe," and that "the premises owner assumes
only a narrow duty to ensure that its rules or requirements do not unreasonably
increase the probability and severity of injury"). 

 We hold that the Smiths presented legally insufficient evidence to support the
jury's finding that Union Carbide exercised or retained some control over the manner
in which Oliver's work at Union Carbide's premises was performed, other than the
right to order the work to start or stop or to inspect progress or receive reports. 
Accordingly, we further hold that the trial court erred in denying Union Carbide's
motion for judgment notwithstanding the verdict.

 We sustain Union Carbide's first issue. Having sustained Union Carbide's first
issue, we need not consider Union Carbide's second issue, in which it contends that
the evidence is legally insufficient to support the jury's negligence finding against
Union Carbide.


Workers' Compensation

 In its first issue, Hexion argues that the trial court erred in denying its motion
for judgment notwithstanding the verdict because the evidence conclusively
established Hexion's affirmative defense that the Smiths' claims are barred under the
exclusive remedy provision of the Texas Workers' Compensation Act. See Tex. Lab.
Code Ann. 408.001-408.222 (Vernon 2006 & Supp. 2008). 

 The Smiths sued Hexion both in its capacity as a direct employer of Oliver and
in its capacity as the "successor-in-interest to the liabilities of Smith-Douglas
Company, Inc.," Oliver's former employer. In their petition, the Smiths alleged that
Oliver was employed by Hexion at its Texas City facility as a pipefitter from
approximately 1957 to 1968. During this time, Oliver was continually exposed to
asbestos and Hexion, as Oliver's employer, breached its duty to provide Oliver a safe
work environment. The Smiths further alleged that Oliver's mesothelioma was
caused by his employment with Hexion "and/or its predecessors-in-interest" Smith-Douglas. The Smiths' allegations against Hexion, in its capacity as his direct
employer and in its capacity as successor-in-interest to Smith-Douglas, his former
employer, were identical. Moreover, because the Smiths alleged that Oliver was
exposed to asbestos during his entire time at Hexion's facility, they did not make any
specific allegation as to Oliver's exposure only during his employment at the Hexion
facility as a direct employee for Hexion or during Oliver's employment at the facility
for Smith-Douglas. At trial, the Smiths also presented evidence that Oliver was
exposed to asbestos during his entire employment at Hexion's facility both initially
as an employee of Smith-Douglas and subsequently as a direct employee of Hexion. 
 The parties agree that, from 1957 until 1964, Oliver worked at Hexion's facility
as an employee of Smith-Douglas and that, on December 30, 1964, Hexion, then
known as the Borden Company, acquired Smith-Douglas through a merger, making
Hexion the successor-in-interest to the assets and liabilities of Smith- Douglas. 
Oliver continued to work at Hexion's facility until 1968, which, after the merger, was
operated as the Smith-Douglas division of Hexion. It is undisputed that after the
merger, Hexion provided workers' compensation insurance to its employees at the
facility, including Smith, and that this coverage remained in place for the duration of
Oliver's employment with Hexion. The policies provided workers' compensation
coverage for injuries "by disease caused or aggravated by exposure of which the last
day of the last exposure, in the employment of the insured, to conditions causing the
disease occurs during the policy period." Thus, it is undisputed on appeal that Oliver
was covered by workers' compensation insurance while employed by Hexion after
the merger and that this workers' compensation coverage applied to his
mesothelioma.

 Prior to trial, Hexion sought summary judgment on all of the Smiths' claims
on the ground that the claims are barred by the exclusive remedy provision of the
Texas Workers' Compensation Act (the "Act"). The trial court granted Hexion
summary judgment in part "as to claims relating to the period on or after January 1,
1965," the date of the merger. However, the trial court denied Hexion's summary
judgment motion as to the Smiths' claims against Hexion "related to the period before
January 1, 1965," the period before the merger in which Oliver was employed by
Smith-Douglas. Thus, the effect of the trial court's summary judgment ruling was
that the Smiths were barred from pursuing their claims against Hexion, in its capacity
as Oliver's direct employer, arising from Oliver's exposure to asbestos at Hexion
post-merger. However, the Smiths were allowed to pursue their claims against
Hexion in its capacity as successor-in-interest to Smith-Douglas arising from Oliver's
exposure to asbestos at Hexion's facility pre-merger. (8)

 During trial, Hexion sought a directed verdict on the Smiths' claims against it
in its capacity as the successor-in-interest to Smith-Douglas, again citing the
exclusive remedy provision of the Act. Hexion noted that the Act treats occupational
diseases as a single injury arising when the employee knows or should know that he
has an occupational disease and that the relevant policies provided coverage for
Oliver's mesothelioma. Hexion asserted that the "exclusive remedy provision" of the
Act should not be disregarded "merely because Hexion acquired Smith-Douglas and
merged it into Hexion." The Smiths responded that the bar under the Act does not
apply to their claims made against Hexion in its capacity as successor-in-interest to
Smith-Douglas. The trial court denied Hexion's motion for directed verdict. Hexion 
subsequently filed its motion for judgment notwithstanding the verdict, which the
trial court also denied.

 The exclusive remedy provision of the Act provides,

(a) Recovery of workers' compensation benefits is the exclusive
remedy of an employee covered by workers' compensation
insurance coverage or a legal beneficiary against the employer or
an agent or employee of the employer for the death of or a
work-related injury sustained by the employee.


Tex. Lab. Code Ann. § 408.001 (Vernon 2006); see also id. § 406.031(a) (Vernon
2006) (providing that insurance carrier is liable for employee's injury without regard
to fault or negligence if at time of injury employee is subject to subtitle and injury
arises out of and in course and scope of employment); id. § 406.031(b) (providing
that if injury is occupational disease, employer "in whose employ the employee was
last injuriously exposed to the hazards of the disease is considered to be the employer
of the employee under this subtitle"); id. § 408.007 (providing that "date of injury"
for occupational disease is date on which employee knew or should have known that
disease may be related to employment).

 Here, both the Smiths and Hexion agree that Oliver's mesothelioma qualifies
as a work-related injury. Also, the Smiths have not challenged the trial court's
summary judgment ruling barring them from pursing their claims against Hexion 
related to Oliver's asbestos-exposure at Hexion's facility following the merger on the
basis of the exclusive remedy provision of the Act. Rather, the sole dispute presented
in this appeal in regard to the workers' compensation issue is whether the exclusive
remedy provision of the Act applies to the Smiths' claims made against Hexion in its
capacity as successor-in-interest to Smith-Douglas that are related to Oliver's
exposure at Smith-Douglas prior to the merger. 

 Although this specific issue is one of first impression, our sister court has
considered a closely related matter. See Davis v. Sinclair Refining Co., 704 S.W.2d
413, 414 (Tex. App.--Houston [14th Dist.] 1985, writ ref'd n.r.e.). There, Davis, the
plaintiff, sought to recover damages beyond what he had received under the existing
workers' compensation laws for injuries that he had sustained while working at an
Arco refinery. Id. In 1965, Sinclair Refining owned the refinery and, during its
ownership, it had negligently installed a connection to a pump. Id. In 1968 and 1969,
Sinclair Refining merged with Sinclair Oil, which then merged with Arco. Id. After
these mergers, Davis, who had been hired by Arco to work at the refinery, was
instructed to make repairs to a leak in the pump. Id. During his repairs, the faulty
connection on the pump gave way and Davis was burned. Id. Davis received
workers' compensation from Arco's insurance carrier, but he also filed a separate
lawsuit against both Sinclair and Arco for Sinclair's negligence in installing the
connection. Id. Sinclair and Arco sought summary judgment on the ground that
Davis had elected his remedy and accepted his benefits under the Act. Id. 

 In an effort to avoid the exclusive remedy provision of the Act, Davis, citing
another provision which allowed an injured employee to sue a third party tortfeasor
whose negligence caused his injuries, (9)
 argued that he should be allowed to sue Arco
because Arco, through the mergers, had "assumed, by contract and operation of law,
the obligations and liabilities of a third party tortfeasor, Sinclair Refining." Id. In
order to answer the issue, the court examined the history and purpose of the Act. Id.
at 415. The court first noted that the Act was "intended to and [did] provide an
exclusive system governing compensation to employees for injuries arising from their
employment." Id. Also, "[i]n taking away from the subscribing employer certain
defenses and relieving the employee of the burden of proving negligence, it was
provided that these benefits are made available in derogation of the employee's rights
at common law." Id. The court further noted that the system is "voluntary and
elective upon the decision of both the employer and employee" and "when the two
[had] elected to participate under the Act, they [had] voluntarily agreed that the rights
and remedies otherwise existing under the common law shall not be operative." Id. 
The court held that because Davis had elected his remedy against his employer, Arco,
he should not then be allowed to attempt to distinguish his employee status and sue
Arco again by "invoking the third party tortfeasor exception to the Act." Id. at 416. 
The court concluded, "The Act is very clear; once the employee elects to accept
benefits from the employer under the Act, he has no further cause of action against
the employer." Id.

 In holding that Davis's claims were barred by the exclusive remedy provision
of the Act, the court rejected Davis's argument that he had retained his claims against
Arco "because Arco assumed the liabilities of Sinclair Refining under the merger
laws of the Texas Business Corporation Act." Id. at 415 (citing Tex. Bus. Corp. Act
Ann. art. 5.06 (Vernon Supp. 2008) (providing that "separate existence of every
domestic corporation that is a party to the merger, except any surviving or new
domestic corporation, shall cease" and that "all liabilities and obligations" of merged
corporation "shall be allocated" to surviving or new corporation)). The court
emphasized that "the corporate merger statutes were not intended to be used to
circumvent the clear public policy" of the Act. Id.

 Here, similar to Davis, the Smiths do not seek to impose liability upon Hexion
for Hexion's individual negligence post-merger in its capacity as Oliver's direct
employer. Those claims were resolved by the unchallenged summary judgment ruling
which was based upon the exclusive remedy provision of the Act. Rather, the Smiths
seek to impose liability upon Hexion for the negligence of Smith-Douglas, Hexion's
predecessor and Oliver's former employer, which occurred prior to the merger. We
recognize the obvious factual distinctions from Davis, i.e., that, unlike Oliver, Davis
was never an employee of the predecessor corporation (Sinclair) that committed the
negligence for which he sought to hold his employer (Arco) liable. This factual
distinction makes stronger the argument for the application of the exclusive remedy
provision of the Act in this case. Here, during Oliver's tenure as a worker at the
Hexion facility, he worked first as an employee of Smith-Douglas and then, post-merger, as a direct employee of Hexion at the Smith-Douglas division. At the time
of the merger, Hexion purchased workers' compensation insurance. The insurance,
by its plain terms, applies coverage for Oliver's occupational disease, and even the
Smiths do not challenge the applicability of the insurance policy, at least as to
Oliver's mesothelioma arising from his asbestos-exposure that occurred post-merger. 
Accordingly, we hold that Oliver's claims against Hexion, his employer, arising from
his abestos-exposure while working at the Hexion facility as an employee of Smith-Douglas, are barred by the exclusive remedy provision of the Act.

 We decline the Smiths' request to apply, on the facts presented, the "dual-persona" doctrine as a means to avoid the exclusive remedy provision of the Act. (10) 
See Davis, 704 S.W.2d at 414 (explaining that "dual persona" doctrine is "a concept
based upon the surviving corporation's responsibilities under the statutory merger
scheme as separate from its role as corporate employer under the workers'
compensation laws"). The "dual-persona" doctrine has never been adopted by a
Texas court as a means for imposing liability on a subscribing employer and avoiding
the exclusive remedy provision of the Act. In fact, in Davis, although the court
devoted its most substantial discussion to the scope of the dual-capacity doctrine, and
provided only passing reference to the dual-persona doctrine, the underlying facts
addressed by the court in that case actually more closely implicated the dual-persona
doctrine, which the court impliedly rejected. See Davis, 704 S.W.2d at 414-15. 

 Even if we were inclined to apply a limited dual-persona doctrine, we note that
courts in other jurisdictions have applied this doctrine on facts more akin to those
presented in Davis than those presented in the instant case. See Percy v. Falcon
Fabricators, Inc., 584 So. 2d 17, 18 n.3 (Fla. Dist. Ct. App. [3rd Dist.] 1991)
(describing "dual persona" as "focus[ing] not on whether the employer was acting in
his capacity as provider of services on the job site or manufacturer of equipment used
on the job site, but on the corporate merger by which the successor corporation,
which coincidentally is also the employer, assumed the debts and liabilities of the
entity that manufactured the product") (emphasis added); Kimzey v. Interpace Corp.,
Inc., 694 P.2d 907, 912 (Kan. Ct. App. 1985) (applying dual-persona doctrine and
noting that "[p]laintiff's action is essentially an attempt to recover from a third-party
manufacturer of a defective machine through a suit against its successor
corporation."); Billy v. Consol. Mach. Tool Corp., 51 N.Y.2d 152, 162 (N.Y. 1980)
(applying dual-persona doctrine and noting that "[i]nasmuch as plaintiff's action
represents essentially an attempt to recover from third-party manufacturers through
a suit against their corporate successor, plaintiff should be permitted to maintain the
action, notwithstanding that the successor corporation is also an employer which
would otherwise be immune from suit").

 Moreover, we cannot agree with the Smiths that section 417.004 of the Act,
entitled "Employer Liability to Third Party," somehow evidences a legislative intent
to adopt the dual-persona doctrine. Section 417.004 provides,

In an action for damages brought by an injured employee, a legal
beneficiary, or an insurance carrier against a third party liable to pay
damages for the injury or death under this chapter that results in a
judgment against the third party or a settlement by the third party, the
employer is not liable to the third party for reimbursement or damages
based on the judgment or settlement unless the employer executed,
before the injury or death occurred, a written agreement with the third
party to assume the liability.


Tex. Lab. Code Ann. § 417.004 (Vernon 2006). By its plain terms, section 417.004
protects a workers' compensation subscriber from liability to a third-party who is
liable to pay damages for the injury or death "under this chapter that results in a
judgment against the third party or a settlement by the third party" in the absence of
a "written agreement with a third party to assume liability." See id. 

 Finally, contrary to the Smiths' argument otherwise, the Texas Supreme Court
did not effectively adopt the dual-persona doctrine in Enserch Corp. v. Parker, 794
S.W.2d 2 (Tex. 1990) and Dorchester Gas Corp. v. American Petrofina, Inc., 710
S.W.2d 541 (Tex. 1986). In Enserch Corp., the supreme court considered the
"enforceability of an indemnity agreement" entered into between a pipeline owner
and operator, Enserch, and a contractor-employer, Christie, which provided that
Christie assumed all liability for any claims arising out of the performance of the
contract and that Christie would indemnify Enserch in respect of any such matters. 
794 S.W.2d at 4, 6-7. Two Christie employees were subsequently killed in
performing the work specified in the contract, and the workers brought suit against
Enserch, who then sought indemnity from Christie based upon their indemnity
agreement. Id. at 4. The court considered a predecessor version of section 417.004,
which prohibited "indemnity in the workers' compensation context unless one party
expressly agrees to indemnify the other in writing." Id. at 7. The court, in examining
the indemnity language, concluded that the contractor-employer had "expressly
assumed liability for injuries to its own employees" in the indemnity agreement with
the pipeline owner and, thus, the pipeline owner's indemnity claim was not barred by
the Act. Id. at 8. Enserch Corp. did not involve an employee's ability to sue its own
subscribing employer under the dual-persona doctrine. 

 In Dorchester Gas Corp., Fina sold a refinery to Dorchester, a Dorchester
employee was subsequently injured and collected workers' compensation benefits,
and the worker and carrier then sued Fina. 710 S.W.2d at 541-42. Fina settled the
suit and then filed suit against Dorchester seeking indemnity for the settlement
payment based upon the indemnity clause in the purchase and sale agreement. Id. at
542. The court held that the indemnity clause did not reflect that the parties had
clearly and unequivocally intended for Dorchester to indemnify Fina against all injury
or damages, whether or not they were based upon Fina's negligence or due to Fina's
supplying of a defective product. Id. at 543-44. The court did not consider the
exclusivity provision of the Act or the dual-persona doctrine in its opinion. 

 In sum, having concluded that there is no authority in Texas for applying the
dual-persona doctrine under these circumstances, and having rejected the Smiths'
arguments that this doctrine has been effectively adopted by the Texas Supreme
Court, we decline to apply it here as a means to impose liability upon Hexion in
contravention of the exclusive remedy provision of the Act. Accordingly, we hold
that the trial court erred in denying Hexion's motion for judgment notwithstanding
the verdict. 

 We sustain Hexion's first issue. Having held that the Smiths' claims against
Hexion are barred by the exclusive remedy provision of the Act, we need not consider
Hexion's remaining issues.


Conclusion

 We reverse the trial court's judgment and render a take nothing judgment in
favor of Union Carbide and Hexion. 


 

 Terry Jennings

 Justice


Panel consists of Justices Jennings, Alcala, and Higley.

1. Hexion was formerly known as Borden Chemicals, Inc., Borden, Inc., and The Borden
Company.
2. Oliver D. Smith died as a result of the disease following the trial court proceedings.
3. See Tex. Civ. Prac. & Rem. Code Ann. § 95.003 (Vernon Supp. 2008).
4. See Tex. Lab. Code Ann. §§ 408.001-408.222 (Vernon 2006 & Supp. 2008).
5. Chapter 95 applies only to a claim "(1) against a property owner, contractor, or
subcontractor for personal injury, death, or property damage to an owner, a contractor,
or a subcontractor or an employee of a contractor or subcontractor; and (2) that arises
from the condition or use of an improvement to real property where the contractor or
subcontractor constructs, repairs, renovates, or modifies the improvement." See Tex.
Civ. Prac. & Rem. Code Ann. § 95.002 (Vernon Supp. 2008); see also id. §
95.001(1), (3) (Vernon Supp. 2008) (defining "Claim" as "a claim for damages caused
by negligence, including a counterclaim, cross-claim, or third party claim" and
"Property owner" as "a person or entity that owns real property primarily used for
commercial or business purposes"). 


 We note that our sister court has recently issued a plurality opinion questioning the
broad application of Chapter 95 by Texas courts. See Hernandez v. Brinker Int'l, Inc.,
285 S.W.3d 152 (Tex. App.--Houston [14th Dist.] 2009, no pet.). However, the
Smiths' case against Union Carbide was tried under Chapter 95, the unchallenged jury
charge predicated Union Carbide's liability based upon the requisite findings under
Chapter 95, and the parties on appeal agree that Chapter 95 was properly applied. The
sole issue presented by the parties in this appeal in regard to Chapter 95 is whether
there is sufficient evidence to support the jury's finding that Union Carbide controlled
the details of Oliver's work and, thus, whether Union Carbide is liable to the Smiths
for causing Oliver's mesothelioma.
6. Union Carbide does not challenge the sufficiency of the evidence to support a finding
that, as the property owner, it had actual knowledge of the danger or condition
resulting in Oliver's mesothelioma and failed to adequately warn. See Tex. Civ.
Prac. Rem. Code Ann. § 95.003(2) (Vernon Supp. 2008). Accordingly, our focus
is on the control issue in section 95.003(1). See id. § 95.003(1). 
7. Here, the jury was asked in the charge to determine whether "Union Carbide
exercise[d] or retain[ed] some control over the manner in which [Oliver's] work at
Union Carbide's premises was performed, . . . ." (Emphasis added). Because the
Smiths did not challenge this jury question at trial or on appeal, we may not consider
whether the question properly focused solely on whether Union Carbide controlled
the manner of Oliver's work, as opposed to the work being performed by the other
contractors or employees on Union Carbide's premises. We note that the question as
phrased many not be appropriate in all cases brought under Chapter 95. For example,
here, the Smiths argued at trial that Oliver was exposed to asbestos at Union Carbide
both directly in the course of work he performed and as a bystander to the work
performed by other Union Carbide employees or contractors. Under these facts, the
submission of a question that focuses solely on the property owner's control over the
plaintiff-contractor's work omits any inquiry into whether the property owner
exercised control over the other injury-causing work being performed by other non-plaintiff contractors or employees. Section 95.003, by its plain terms, does not appear
to have such a limited focus, at least in all cases. Instead, section 95.003 refers to
whether the property owner exercised or retained control over the manner in which
"the work" is performed. Tex. Civ. Prac. & Rem. Code Ann. § 95.003(1). In cases
where the plaintiff-independent contractor alleges that the owner's direct employees
or third-party contractors performed the injury-causing work,"the work" contemplated
by Chapter 95 potentially includes reference to the injury-causing work performed by
the property owner's employees or third parties. The relevant Texas Pattern Jury
Charge supports the idea that a jury question, under facts similar to those presented
here, might appropriately be more broadly focused on the injury-causing work rather
than limited solely to the work performed by the plaintiff-independent contractor. 
Specifically, in a Chapter 95 case, a jury might be appropriately asked whether the
property owner exercised or retained some control over "the manner" in which "the
injury-causing" or "the defect-producing" work was performed, other than the right
to order the work to start or stop or to inspect the progress or receive reports. See
State bar of Tex., Texas Pattern Jury Charges-Malpractice, Premises &
Products PJC 66.14 (2008). The comments to this pattern jury charge further state
that "[t]erms describing the particular work alleged to have caused the injury or
produced the defect should be substituted" for the above quoted phrases in the charge
and that "[i]f it is agreed that the case involves only one condition," it is
recommended "that the particular condition . . . be substituted for the phrase the
condition." See State bar of Tex., Texas Pattern Jury Charges-Malpractice,
Premises & Products PJC 66.14 cmts. (2008). Nevertheless, absent any challenge
to this question at trial and on appeal, we focus on the sufficiency of the evidence to
support the jury's finding that Union Carbide exercised or retained control over the
manner in which Oliver's work was performed. 
8. The trial court's granting of summary judgment in favor of Hexion "as to claims
relating to the period on or after January 1, 1965" applied to all of the Smiths' claims
against Hexion, in its individual capacity, including the Smiths' gross negligence
claims. 
9. Although Davis cited a section from the predecessor version of the Act, the current
Act continues to authorize an employee to seek damages from a third-party tortfeasor. 
See Tex. Lab. Code Ann. § 417.001(a) (Vernon 2006) ("An employee or legal
beneficiary may seek damages from a third party who is or becomes liable to pay
damages for an injury or death that is compensable under this subtitle and may also
pursue a claim for workers' compensation benefits under this subtitle.").

10. We note that although Hexion argues in its briefing against the application of the
"dual-capacity" doctrine, the Smiths do not suggest that Hexion should be held liable
under this doctrine. In fact, the Smiths recognize that Texas courts have rejected the
dual-capacity doctrine. See Payne v. Galen Hosp. Corp., 28 S.W3d 15, 20 n.4 (Tex.
2000) (explaining that, under "dual capacity" doctrine, "an employer normally
shielded from liability by the workers' compensation exclusive-remedy principle may
become liable in tort to an employee if it occupies, in addition to its capacity as an
employer, a second capacity that confers on it obligations independent of those
imposed on it as an employer"; noting that Texas courts of appeals have "uniformly
rejected" dual-capacity doctrine); Ramirez v. Pecan Deluxe Candy Co., 839 S.W.2d
101, 108 (Tex. App.--Dallas 1992, writ denied) (stating that "Texas law currently
mandates against the judicial adoption of this [dual-capacity] doctrine").